UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ANDOCHE CAMBRE | CIVIL ACTION |
| VERSUS | NO. 17-3643 |
| BP EXPLORATION & PRODUCTION, INC., ET AL. | SECTION D (5) |

## ORDER

Before the Court is BP's *Daubert* Motion to Exclude the Causation Testimony of Plaintiff's Expert, Dr. Jerald Cook[1] filed by Defendants BP Exploration & Production Inc., BP America Production Company, BP p.l.c., Halliburton Energy Services, Inc., Transocean Holdings, LLC, Transocean Deepwater, Inc., and Transocean Offshore Deepwater Drilling, Inc. (collectively "Defendants") as well as Defendants' Motion for Summary Judgment.[2] Plaintiff Andoche Cambre ("Plaintiff") opposes both Motions.[3] Defendants have filed Replies in support of their Motions.[4]

After careful consideration of the parties' memoranda, the record, and the applicable law, the Motions are **GRANTED**.

### I.  FACTUAL & PROCEDURAL BACKGROUND

This case arises from the *Deepwater Horizon* oil spill in the Gulf of Mexico in 2010 and the subsequent cleanup efforts of the Gulf Coast. On January 11, 2013, United States District Judge Carl J. Barbier, who presided over the multidistrict litigation arising out of the *Deepwater Horizon* incident, approved the *Deepwater*

---

[1] R. Doc. 46.
[2] R. Doc. 47.
[3] R. Doc. 55; R. Doc. 56.
[4] R. Doc. 62; R. Doc. 63.

*Horizon* Medical Benefits Class Action Settlement Agreement (the "MSA").[5] However, certain individuals, referred to as "B3" plaintiffs, either opted out of or were excluded from the MSA.[6] Plaintiff Andoche Cambre opted out of the MSA and, accordingly, is a B3 plaintiff.[7]

Plaintiff filed this individual action against Defendants on April 18, 2017 to recover for injuries allegedly sustained as a result of the oil spill.[8] For approximately three months in 2010, Plaintiff worked as a beach cleanup worker, tasked with cleaning up oil and oil-covered debris from the beaches and coastal areas in Gulfport and Biloxi, Mississippi.[9] Plaintiff alleges that Defendants' negligence and recklessness in both causing the Gulf oil spill and subsequently failing to properly design and implement a clean-up response caused him to suffer myriad injuries including shortness of breath, headaches, rashes, boils, and sinus problems.[10] Specifically, Plaintiff seeks to recover economic damages, personal injury damages—including damages for past and future medical expenses and for pain and suffering—punitive damages, and attorneys' fees, costs, and expenses.[11]

To help support his claims that exposure to the chemicals present in the oil spilled by Defendants caused his particular health symptoms, Plaintiff offers the

---

[5] *See* Brown v. BP Expl. & Prod. Inc., Civ. A. No. 18-9927, 2019 WL 2995869, at *1 (E.D. La. July 9, 2019) (citation omitted) (Africk, J.).
[6] *See In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on Apr. 20, 2010*, No. MDL 2179, 2021 WL 6053613, at *2 (E.D. La. Apr. 1, 2021).
[7] R. Doc. 1 at ¶ 5.
[8] *Id.*
[9] R. Doc. 46-1 at p. 2; R. Doc. 46-3 at p. 5.
[10] R. Doc. 1 at pp. 4–5; R. Doc. 1-1 at pp. 5, 8.
[11] R. Doc. 1 at pp. 5–6.

report ("Report") and testimony of Dr. Jerald Cook.[12] Dr. Cook is a retired Navy physician with expertise specifically as an occupational and environmental physician.[13] Dr. Cook's Report is not tailored directly to Plaintiff's claims; rather, Dr. Cook's generic causation report has been utilized by numerous B3 plaintiffs, including many plaintiffs currently before this Court as well as in other cases before other sections of this court.[14] Accordingly, Dr. Cook's Report pertains only to general causation and not to specific causation.[15]

Dr. Cook's Report from March 14, 2022—the second version of his Report and the one at issue in this case—contains five chapters.[16] Chapter 1 details Dr. Cooks expert credentials, which Defendants do not challenge.[17] Chapter 2 describes the *Deepwater Horizon* oil spill.[18] Chapter 3 outlines the particular methodologies employed by Dr. Cook in reaching his opinions.[19] Specifically, Dr. Cook describes how he relied upon the so-called Bradford Hill factors in conducting his general causation analysis.[20] After evidence demonstrating an association between a particular chemical and a disease has been established, the Bradford Hill criteria are used to determine whether a causal relationship exists.[21] One factor in particular, the dose-

---

[12] R. Doc. 46-4.
[13] *Id.* at p. 5.
[14] R. Doc. 46-1 at p. 3; *Johns v. BP Expl. & Prod. Inc.*, No. CV 17-3304, 2022 WL 1811088, at *2 (E.D. La. June 2, 2022) (Ashe, J.) ("Cook issued an omnibus, non-case specific general causation expert report that has been used by many B3 plaintiffs.").
[15] R. Doc. 56 at p. 3 ("[P]laintiffs had Dr. Cook prepare a report with his general causation opinions[.]").
[16] R. Doc. 46-4.
[17] *Id.* at p. 5; R. Doc. 46-1 at p. 6.
[18] R. Doc. 46-4 at p. 7.
[19] *Id.* at p. 14.
[20] *Id.* at pp. 24–29.
[21] *Id.* at p. 24. The Bradford Hill criteria include: "(1) Temporal relationship, (2) Strength of the association, (3) Dose-response relationship, (4) Replication of the findings, (5) Biological plausibility,

response relationship, underlies the main basis of Defendants' argument regarding the unreliability of the Report.[22]

Next, Chapter 4 discusses a number of studies examining both the *Deepwater Horizon* oil spill as well as other historic oil spills from around the world.[23] This section purports to demonstrate a relationship between exposure to oil and a variety of diseases and health effects. The Report includes a number of Tables with data taken from several oil spill studies demonstrating a higher prevalence of certain health conditions among those spill responders who were exposed to oil as compared to persons not exposed.[24] Finally, Chapter 5 presents Dr. Cook's opinions on general causation for several different categories of health conditions: (1) respiratory conditions; (2) dermal conditions; (3) ocular conditions; and (4) cancer.[25]

Defendant filed the instant Motions on June 13, 2022.[26] In their *Daubert* Motion *in Limine*, Defendants contend that Dr. Cook's report should be excluded as it is both unreliable and unhelpful to the trier of fact.[27] Defendants primarily point to the opinions of other sections of this court which have excluded this very same Report on grounds of unreliability to suggest that this Court should likewise exclude the Report.[28] Further, Defendants contend that Dr. Cook's specific methodology is

---

(6) Consideration of alternative explanations, (7) Cessation of exposure, (8) Specificity of the association, and (9) Consistency with other knowledge." *Id.* at p. 25 (citing *Reference Manual on Scientific Evidence, Third Edition* (National Research Council, 2011)).
[22] R. Doc. 46-1 at pp. 7–11.
[23] R. Doc. 46-4 at p. 32.
[24] *Id.* at pp. 46–60.
[25] *Id.* at p. 70.
[26] R. Doc. 46; R. Doc. 47.
[27] R. Doc. 46-1 at p. 6.
[28] *Id.* at pp. 7–8; R. Doc. 63 at pp. 2–3.

unreliable and that Dr. Cook failed to establish the harmful level of exposure to the chemicals Plaintiff allegedly was exposed to at which harmful health effects occur.[29] Next, because Dr. Cook should be excluded to testify, Defendants argue, the Court should grant their Motion for Summary Judgment as Plaintiff is unable to establish general causation through expert testimony, a necessary requirement under controlling Circuit precedent.[30]

Plaintiff disputes Defendants' characterization of Dr. Cook's Report. Plaintiff argues that Dr. Cook utilized a proper methodology in conducting his general causation analysis and that he thoroughly explained his methods.[31] Further, Plaintiff argues that the Report does provide adequate harmful exposure level data for each health condition exhibited by Plaintiff and that to the extent that Dr. Cook is unable to provide more specific exposure-level data, it is the fault of Defendants for improperly restricting access to scientific research teams to gather such data.[32] Finally, Plaintiff contends that expert testimony is not necessary for a transient symptom case. In support of that argument, Plaintiff points to orders from other sections of this court in which the court found that "expert testimony on general causation combined with specific evidence of the nature of the class member's exposure is sufficient to permit the jury to conclude that the E.A. release was more likely than not the cause of the class representative's transient symptoms."[33]

---

[29] R. Doc. 46-1 at pp. 7–16.
[30] R. Doc. 47-1 at p. 2.
[31] R. Doc. 56 at pp. 19–20.
[32] *Id.* at pp. 4–14.
[33] *Id.* at p. 16 n.15 (quoting *Guidry v. Dow Chem. Co.* No. 19-12233, 2021 WL 4460505, at *3 (E.D. La. Sept. 29, 2021)).

Further, in his opposition to Defendants' Motion for Summary Judgment, Plaintiff points to orders from other sections of this court which concluded that expert testimony may not be required to establish symptoms within the common knowledge of lay people.[34]

The Court addresses each argument and each Motion in turn.

## II. LEGAL STANDARD

### A. Motion *in Limine*

The district court has considerable discretion to admit or exclude expert testimony under Fed. R. Evid. 702,[35] and the burden rests with the party seeking to present the testimony to show that the requirements of Rule 702 are met.[36] Rule 702 provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education may testify in the form of an opinion" when all of the following requirements are met:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.[37]

---

[34] R. Doc. 55 at pp. 4–6.
[35] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39, 118 S.Ct. 512 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000); *Tajonera v. Black Elk Energy Offshore Operations, LLC*, Civ. A. No. 13-0366 c/w 13-0550, 13-5137, 13-2496, 13-5508, 13-6413, 14-374, 14-1714, 2016 WL 3180776, at *8 (E.D. La. June 7, 2016) (Brown, J.) (citing authority).
[36] *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).
[37] Fed. R. Evid. 702; *Tajonera*, Civ. A. No. 13-0366, 2016 WL 3180776, at *8.

Rule 702 codifies the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which charges district courts to act as "gatekeepers" when determining the admissibility of expert testimony.[38] "To be admissible under Rule 702, the court must find that the evidence is both relevant and reliable."[39] According to the Fifth Circuit, reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid, while relevance depends on whether the reasoning or methodology underlying the testimony can be properly applied to the facts at issue.[40] The purpose of the reliability requirement is to exclude expert testimony based merely on subjective belief or unsupported speculation.[41]

To satisfy the reliability prong of the *Daubert*/Rule 702 analysis, a "party seeking to introduce expert testimony must show (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[42] To prove reliability, the proponent of the expert testimony must present some objective, independent validation of the expert's methodology.[43] The objective of this Court's gatekeeper role is to ensure that an expert "employs in the

---

[38] *United States v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).
[39] *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012) (citing *United States v. Valencia*, 600 F.3d 389, 423 (5th Cir. 2010)).
[40] *Ebron*, 683 F.3d at 139 (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)).
[41] *Tajonera*, 2016 WL 3180776, at *8 (citing *Daubert*, 509 U.S. at 590).
[42] *Recif Res., LLC v. Juniper Cap. Advisors, L.P.*, Civ. A. No. H-19-2953, 2020 WL 5623982, at *2 (S.D. Tex. Sept. 18, 2020) (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)) (internal quotation marks omitted).
[43] *Recif Resources, LLC*, 2020 WL 5623982, at *2 (citing *Brown v. Illinois Cent. R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013)).

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[44]

### B. Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[45] When assessing whether a genuine dispute regarding any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[46] While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions or "only a scintilla of evidence."[47] Instead, summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party.[48]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[49] The non-moving party can then defeat summary judgment by either submitting evidence

---

[44] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (5th Cir. 2006).
[45] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).
[46] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citations omitted).
[47] *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotation marks omitted).
[48] *Delta & Pine Land Co.*, 530 F.3d at 399 (citing *Anderson*, 477 U.S. at 248).
[49] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991).

sufficient to demonstrate the existence of a genuine dispute of material fact, or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[50] If, however, the nonmoving party will bear the burden of proof at trial on the dispositive issue, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[51] The burden then shifts to the nonmoving party who must go beyond the pleadings and, "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[52]

### III. ANALYSIS

#### A. Motion *in Limine*

The Court recognizes that it does not write on a blank slate when addressing the admissibility of Dr. Cook's expert report dated March 14, 2022. Every section of this court—eight in total—to have considered the identical issue presented in the instant Motion has uniformly held that Dr. Cook's report fails to satisfy the *Daubert* standards for reliability.[53] While the Court finds the thoughtful opinions and

---

[50] *Id.* at 1265.
[51] *See Celotex*, 477 U.S. at 322–23.
[52] *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).
[53] *See, e.g., Novelozo v. BP Expl. & Prod. Inc.*, No. CV 13-1033, 2022 WL 1460103 (E.D. La. May 9, 2022) (Africk, J.); *Johns*, 2022 WL 1811088 (Ashe, J.); *Heathington v. BP Expl. & Prod. Inc.*, No. CV 17-4353, 2022 WL 2986490 (E.D. La. July 28, 2022) (Barbier, J.); *Baggett v. BP Expl. & Prod. Inc.*, No. CV 17-3030, 2022 WL 4242521 (E.D. La. Sept. 13, 2022) (Guidry, J.); *Reed v. BP Expl. & Prod., Inc.*, No. CV 17-3603, 2022 WL 3099925 (E.D. La. Aug. 4, 2022) (Milazzo, J.); *Harrison v. BP Expl. & Prod. Inc.*, No. CV 17-4346, 2022 WL 2390733 (E.D. La. July 1, 2022) (Morgan, J.); *Dawkins v. BP Expl. & Prod., Inc.*, No. CV 17-3533, 2022 WL 2315846 (E.D. La. June 28, 2022) (Vance, J.); *Davis v. BP Expl. & Prod., Inc.*, No. CV 17-4664, 2022 WL 2789027 (E.D. La. July 15, 2022) (Zainey, J.).

analyses of the other Sections to be persuasive, the Court nevertheless conducts an independent inquiry here.

Defendants argue that Dr. Cook's Report should be excluded for five principal reasons: (1) Dr. Cook's failure to verify Plaintiff's alleged medical conditions; (2) Dr. Cook's failure to follow the proper causation-analysis methodology; (3) Dr. Cook's failure to adequately evaluate the relevant scientific epidemiological literature; (4) Dr. Cook's failure to identify the harmful level exposure for each and every chemical that Plaintiff alleges to have been exposed to; and (5) Dr. Cook's failure to make his opinions helpful to the trier of fact in this case due to the lack of overlap between Dr. Cook's opinions and Plaintiff's allegations.[54]

Plaintiff's response is twofold: (1) that expert testimony on specific causation is not required where, as here, the physical symptoms complained of are temporary and within a layperson's common knowledge; and (2) that Dr. Cook's *Daubert* methodology is sufficient to establish general causation.[55] Regarding this latter contention, Plaintiff argues that Dr. Cook has thoroughly analyzed the relevant scientific epidemiological literature such as the Coast Guard Cohort and the GuLF STUDY and that Dr. Cook does address the requisite harmful exposure level data.[56] Additionally, Plaintiff chides Defendants for allegedly obstructing the ability of researchers to conduct a proper analysis of the oil spill by allegedly preventing the

---

[54] R. Doc. 46-1 at pp. 7, 11–16.
[55] R. Doc. 56 at pp. 14, 19.
[56] *Id.* at pp. 9–10, 19–20.

recording of certain dermal and biological monitoring data.[57] Finally, Plaintiff disagrees with Defendants' argument that there is not sufficient overlap between the health effects addressed in Dr. Cook's report and the health effects alleged by Plaintiff.[58]

The burden of proof is on the B3 plaintiffs to prove that "the legal cause of the claimed injury or illness is exposure to oil or other chemicals used during the response."[59] To prove causation, the B3 plaintiffs are required to provide reliable expert testimony.[60] "A plaintiff in such a case cannot expect lay fact-finders to understand medical causation; expert testimony is thus required to establish causation."[61]

Courts use "a two-step process in examining the admissibility of causation evidence in toxic tort cases."[62] First, a court must determine whether general causation exists.[63] "General causation is whether a substance is capable of causing a particular injury or condition in the general population."[64] Second, if the court finds that there is admissible general-causation evidence, "the district court must determine whether there is admissible specific-causation evidence.'"[65] "[S]pecific

---

[57] *Id.* at pp. 4–9. The Court notes that this allegation was the subject of a discovery dispute leading to the imposition of sanctions against Defendants. *See Torres-Lugo v. BP Expl. & Prod., Inc.*, No. 20-210, R. Doc. 136 (E.D. La. July 18, 2022).
[58] R. Doc. 56 at p. 20.
[59] *In re Oil Spill*, 2021 WL 6053613, at *11.
[60] *See, e.g., Seaman v. Seacor Marine, LLC*, 326 Fed. Appx. 721, 723 (5th Cir. 2009).
[61] *Id.* (citing *Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)).
[62] *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007).
[63] *Id.*
[64] *Id.* (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)).
[65] *Id.*

causation is whether a substance caused a particular individual's injury."[66] If the court finds that there is no admissible general causation evidence, it need not consider the issue of specific causation.[67]

To establish general causation, a causation expert must identify "the harmful level of exposure to a chemical" at which physical symptoms manifest.[68] As explained by Dr. Cook, nearly every chemical on Earth may be toxic or even fatal at a certain level of exposure.[69] Thus, causation experts determine not only *whether* a chemical is capable of causing certain health effects, but *at what level* of exposure do those health affects appear. Experts, such as Dr. Cook, refer to this inquiry with the maxim, "the dose determines the poison."[70] This analysis is also referred to in the Bradford Hill factors as the dose-response relationship.[71]

In recognition of the importance of this step of the causation analysis, the American Medical Association's *Guide to the Evaluation of Disease and Injury Causation* states that determining "whether the estimated dose was sufficient to explain observed clinical effects known to be associated with the agent in question" is the "most critical phase of the hazard evaluation process."[72] Relatedly, the Fifth Circuit states that this detail is one of the "minimal facts necessary to sustain the

---

[66] *Id.*
[67] *Id.* ("Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence.").
[68] *Allen*, 102 F.3d at 199.
[69] R. Doc. 46-4 at p. 27; *see also English v. BP Expl. & Prod. Inc.*, No. CV 13-1033, R. Doc. 48-6 (Deposition of Dr. Jerald Cook) at 150:14–16 (E.D. La. September 26, 2022) (Vitter, J.) ("Like I said, something not very harmful, such as water, can become harmful at a high enough dose.").
[70] R. Doc. 46-4 at p. 27.
[71] *Id.*
[72] R. Doc. 46-6 at pp. 6–7. Dr. Cook testified that he regularly consults the AMA *Guide*. *See English*, R. Doc. 48-6 (Deposition of Dr. Jerald Cook) at 59:22–60:1.

plaintiff's burden in a toxic tort case."[73] Plaintiffs must provide reliable expert testimony establishing the requisite level of exposure necessary to cause each alleged physical harm.[74] Accordingly, failure to properly identify the level of exposure to a particular chemical at which harmful effects occur necessarily renders a general causation opinion to be unreliable and, thus, inadmissible.[75]

The Court concurs with the other sections of the court that have addressed this issue and found Dr. Cook's failure to address the level of harmful dosage of each relevant chemical to be ultimately fatal to his report. At no point in his report does Dr. Cook adequately identify what level of exposure to the chemicals present in the oil is capable of producing the harmful health effects alleged by Plaintiff. Indeed, as numerous Sections of this Court have pointed out, Dr. Cook does not even specify the exact chemicals that Plaintiff was allegedly exposed to, let alone provide evidence regarding the level of exposure at which Plaintiff's symptoms might manifest.[76]

Dr. Cook attempts to establish a sufficient dose-response relationship demonstrating the level of exposure to oil required to cause the complained-of

---

[73] *Allen*, 102 F.3d at 199; *accord McGill v. BP Expl. & Prod., Inc.*, 830 Fed. Appx. 430, 433 (5th Cir. 2020) (affirming exclusion of expert's opinions where "none [of the studies on which the expert relied] provide conclusive findings on what exposure level of Corexit is hazardous to humans.").

[74] *Allen*, 102 F.3d at 195; *see also McGill*, 830 Fed. Appx. at 433 n.1 (excluding expert testimony where the studies relied upon by expert "did not address what level of exposure would be unsafe for humans or *what specific illnesses* that exposure may cause.") (emphasis added).

[75] *See Dawkins*, 2022 WL 2315846, at *6 ("Accordingly, if the Court finds that plaintiff cannot 'prove, at [a] minimum, that exposure to a certain level of a certain substance for a certain period of time can cause a particular condition in the general population,' then the Court's inquiry into general causation is complete." (quoting *Williams v. BP Expl. & Prod., Inc.*, No. 18-9753, 2019 WL 6615504, at *8 (E.D. La. Dec. 5, 2019) (Morgan, J.)).

[76] *See, e.g.*, *Dawkins*, 2022 WL 2315846, at *7 ("[Dr. Cook] fails to even specify what constituent chemicals within 'crude oil' and 'weathered oil' he is purportedly analyzing for a dose-response relationship."); *Johns*, 2022 WL 1811088, at *2 ("Yet, Cook's report does not include any opinion about a link between any specific chemical compound and any particular disease.").

symptoms at several points in his report. In Chapter 4, Dr. Cook provides multiple Tables purporting to establish a relationship between exposure to oil and ill health.[77] The data from the Tables themselves is taken from prior studies evaluating the effects of oil exposure on responders to the *Deepwater Horizon* Gulf oil spill.[78] The Tables indicate a statistically significant relationship between oil exposure and the onset of various health problems, including respiratory, neurological, dermal, gastrointestinal, and genitourinary ailments.[79] However, some of these Tables—and the underlying studies—fail to demonstrate the level of exposure to the chemicals in the oil at which these symptoms manifested. Rather, these studies instead concerned themselves only with the binary question of whether or not the workers were exposed to oil at all.[80] This type of study is referred to as an "ever/never" study because the participants are divided into two groups: those that were exposed to oil and those who were not.[81] Taking those studies at face value, the Court emphasizes that studies indicating that health problems may arise from exposure to oil do not answer the essential question of what *level* of exposure is necessary to cause the particular symptoms.[82] As such, the Court finds that these portions of Dr. Cook's Report fail to satisfy Fifth Circuit standards for reliability of expert reports.

---

[77] R. Doc. 46-4 at pp. 46–60.
[78] *Id.* at pp. 44–45. These studies specifically examined Coast Guard service members who were responders in the Deepwater Horizon spill. *See id.*
[79] *See, e.g.*, *id.* at p. 46 (Table 4-1).
[80] *See, e.g.*, *id.* at p. 47 (Table 4-2) (comparing health conditions between responders with and without oil exposure).
[81] *Id.*; *see also id.* at p. 46 ("They compared of responders versus non-responders, and "ever" oil exposure with "never" oil exposure among the responders.").
[82] *See Dawkins*, 2022 WL 2315846, at *8 ("These studies, both of which are 'silent on the level of exposure . . . that would be significant,' do not assist Dr. Cook in meeting [Plaintiff]'s minimal burden

Other Tables in Dr. Cook's Report, however, do provide greater detail on the relationship between the level of exposure to oil and the prevalence of health effects. For instance, Table 4-1 reports the prevalence ratio ("PR") of certain health effects of those who were exposed to oil and further breaks the data down into whether the person had a low, medium, or high exposure.[83] Briefly, the Report reflects that the PR is the ratio comparing the prevalence of symptoms in those who were exposed to the oil versus those who were not.[84] Thus, a higher PR indicates a greater prevalence of a particular health effect in an oil-exposed person as compared to a non-exposed person. Importantly, as Dr. Cook specifically notes, "prevalence ratios do show associations, *but not causation*, because they do not account for when a disease began, so it does not meet the temporal relationship criterion of causation."[85]

Despite ostensibly indicating an association between a higher level of exposure to oil and a greater prevalence of ill health effects, what the data still fails to show is the level of exposure at which each of the complained of health problems manifest. That there is some positive association between prevalence of health effects and the level of exposure does not answer the antecedent—and necessary—question of what particular dose is sufficient to cause the particular health effect. None of these studies show what level of exposure to oil and dispersants is required for health conditions, such as those complained of by Plaintiff, to appear. Accordingly, they too

---

of establishing by '[s]cientific knowledge . . . the harmful level of exposure to a chemical.'" (quoting *Seaman*, 326 Fed. Appx. at 727)).
[83] R. Doc. 46-4 at p. 46.
[84] *Id.* at pp. 56–57.
[85] *Id.* at p. 57 (emphasis added).

are insufficient to satisfy Plaintiff's burden to demonstrate a harmful level of exposure.

Dr. Cook's general causation opinions of specific health conditions found in Chapter 5 of his Report suffer for many of the above reasons. As carefully explained by another section of this court, many of the studies relied upon by Dr. Cook are "silent on the *level of exposure* . . . that would be significant" to demonstrate a proper dose-response relationship.[86] In fact, many of the studies utilize the same "ever/never" dichotomy which, for the reasons explained above, does not satisfy Plaintiff's burden to adequately establish a harmful level of exposure.[87]

The Court recognizes that mathematically precise figures detailing the exact level of exposure at which physical conditions manifest may often be difficult or impossible to ascertain.[88] As Dr. Cook notes, "[t]he quantified dose is usually unknown in epidemiology studies and can be very challenging to accurately measure or estimate."[89] Nevertheless, for the above-discussed reasons, the Court finds that Dr. Cook's Report fails to adequately demonstrate the harmful dosage of the particular chemicals found in the type of weathered oil and dispersants encountered by Plaintiff.

---

[86] *See Dawkins*, 2022 WL 2315846, at *8.
[87] *See, e.g.*, R. Doc. 46-4 at p. 74.
[88] *See Harrison*, 2022 WL 2390733, at *6 ("While Courts 'do not require a mathematically precise table equating levels of exposure with levels of harm . . . there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains before there can be a recovery.'" (quoting *Wright v. Willamette Industries, Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996)).
[89] R. Doc. 46-4 at p. 28.

Plaintiff contends that Dr. Cook's difficulty in utilizing harmful exposure level data stems from Defendants' intentional obstruction of researchers from collecting data on oil cleanup workers.[90] Without addressing the veracity of these allegations, Plaintiff's argument misses the mark because a general causation analysis does not depend upon particular sampling taken from the incident in question. Rather, a general causation expert is allowed to consult the entire universe of relevant epidemiological studies to support their opinion.[91] Dr. Cook, after all, "was not prevented from consulting the relevant scientific and medical literature on the harmful effects of oil to determine whether a relevant chemical has the capacity to cause the harm alleged by plaintiff in the general population."[92] Accordingly, the Court does not find that Dr. Cook is excused from providing the requisite dose-response relationship data on account of Defendants' alleged misdeeds.

Because the Court finds that Dr. Cook's Report fails to demonstrate the "minimal facts necessary to sustain the plaintiff's burden in a toxic tort case,"[93] i.e., the harmful exposure level, the Court does not find it necessary to address Defendant's other arguments as to why the Report should be excluded.[94] Accordingly,

---

[90] R. Doc. 56 at pp. 4–9.
[91] Indeed, Dr. Cook himself utilized studies from different oil spills. R. Doc. 46-4 at pp. 33–35; *see also Heathington*, 2022 WL 2986490, at *4 ("Notably, this inquiry does not depend upon environmental sampling data taken as part of the incident.").
[92] *Dawkins*, 2022 WL 2315846, at *8.
[93] *Allen*, 102 F.3d at 199.
[94] R. Doc. 46-1 at pp. 7, 11–16. Although some sections have addressed multiple rationales for excluding Dr. Cook's Report, *see, e.g.*, *Novelozo*, 2022 WL 1460103, others have relied solely upon Dr. Cook's failure to provide harmful exposure level data as grounds for exclusion, *see, e.g.*, *Johns*, 2022 WL 1811088.

the Court finds that Dr. Cook should be excluded from testifying as an expert on general causation in this matter.

### B. Motion for Summary Judgment

Dr. Cook's Report is Plaintiff's sole expert opinion on general causation.[95] Because the Court finds it appropriate to exclude the Report for failure to comport with the *Daubert* standards for reliability, Plaintiff accordingly lacks expert testimony on general causation. Without expert testimony, which is required to prove general causation,[96] Plaintiff has failed to demonstrate a genuine dispute of material fact as to his claims that his injuries were caused by exposure to oil. "When a plaintiff has no expert testimony to prove his medical diagnosis or causation at trial, the plaintiff's suit may be dismissed at the summary judgment stage."[97] Thus, Defendants' Motion for Summary Judgment must be granted as Defendants are entitled to judgment as a matter of law due to Plaintiff's failure to establish causation.

Plaintiff's further argument that both of Defendants' Motions should be denied because expert testimony is not necessary in a transient symptom case, such as here, and Plaintiff's lay testimony can establish his injuries conflates two separate issues, general causation and specific causation. In support of this argument, Plaintiff cites to orders from other sections of this court which have concluded that "temporary physical irritant symptoms and mental anguish symptoms to be 'within the common

---

[95] Plaintiff's other retained expert, Dr. Rachel Jones, does not address the issue of general causation nor does she cure any of the problems contained within Dr. Cook's Report.
[96] Plaintiff does not dispute that expert testimony is required to establish general causation. *See* R. Doc. 56 at p. 3; *see also, e.g.*, *Perkins v. BP Expl. & Prod.*, No. 17-4476, 2022 WL 972276, at *2 (E.D. La. Mar. 31, 2022) (Milazzo, J.) ("In a toxic tort suit such as this one, the plaintiff must present admissible expert testimony to establish general causation as well as specific causation.").
[97] *Williams*, 2019 WL 6615504, at *11.

knowledge of lay people' and for which expert testimony was not necessary to establish causation."[98] The order relied on by Plaintiff very clearly states, "[b]ecause BP, for purposes of this motion, does not contest Plaintiff's general causation report from Jerald Cook, M.D., (Rec. Doc. 28-2, at 3), the Court will only evaluate specific causation."[99] Indeed, the final sentence of the Order concludes, "[t]herefore, Plaintiff does not require an expert on specific causation for these particular medical conditions."[100] The issue before this Court centers on the sufficiency of Plaintiff's *general* causation expert; thus, Plaintiff's arguments on the necessity of expert testimony to establish *specific* causation are dismissed as irrelevant and without merit.

## IV. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' *Daubert* Motion to Exclude the Causation Testimony of Plaintiff's Expert, Dr. Jerald Cook[101] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment[102] is **GRANTED**.

---

[98] R. Doc. 56 at p. 18 (quoting *Stephens v. BP* (Civ. Action No. 17-4294), *Turner v. BP* (Civ. Action No. 17-4210); *Wallace v. BP* (Civil Action No. 13-1039)).
[99] *Stephens v. BP* (Civ. Action No. 17-4294), R. Doc. 61 at n.2.
[100] *Id.*
[101] R. Doc. 46.
[102] R. Doc. 47.

**IT IS FURTHER ORDERED** that Plaintiff's claims against Defendants are **DISMISSED with prejudice**.

New Orleans, Louisiana, September 27, 2022.

*Wendy B Vitter*
**WENDY B. VITTER**
**United States District Judge**